**In re Jimmy Earl HALE and Carlene Rozann Hale, Debtors.**

**No. 03–01492–PCW13.**

United States Bankruptcy Court, E.D. Washington.

Jan. 24, 2007.

sions to chapter 7 and chapter 13 to completely and utterly remove discretion from bankruptcy judges; that would be unwise and produce a system full of injustices for debtors

and creditors alike. But adoption of the Financial Collection Standards as administered did, in fact, reduce significantly the discretion a court has to find abuse in many cases.

Terry J Preszler, Kennewick, WA, for Jimmy Hale.

## MEMORANDUM DECISION RE: CLAIM OF ORIGEN FINANCIAL, LLC

PATRICIA C. WILLIAMS, Bankruptcy Judge.

### *INTRODUCTION*

This controversy presents multiple issues regarding the interplay between the claims allowance process and the process of confirming and administering a Chapter 13 plan. Convoluted facts often give rise to complicated issues of law which is the situation in this case.

### *FACTS*

On February 21, 2003, the debtors commenced a Chapter 13 case and filed a proposed plan. Under paragraph VII entitled "Special Provisions," the debtors stated "Debtor's (sic) are surrendering house." The initial plan would have required a monthly payment of $549.76 to fund the plan, which had a proposed base of $19,791.36 and an estimated term of 36

months. On March 14, 2003, Origen Financial, LLC (hereinafter "Origen") filed a Proof of Claim in the total amount of $107,825.33. As completed by Origen, the form indicated that based upon the fair market value of the home, Origen held a secured claim of $78,770 and held an unsecured claim of approximately $29,055.33.

The debtors filed a first modification of the proposed plan on March 27, 2003, which increased the monthly plan payment to $992.76 and increased the base to $35,739.37, with an estimated term of 36 months. Another modification, not relevant to these issues, was filed April 25, 2003. On April 28, 2003, the Chapter 13 Trustee (hereinafter "Trustee") filed an amended objection to the debtors' proposed plan as modified. The Trustee required the debtors to specify the creditor holding the lien on the house and to state their intention to surrender under paragraph III.4.b. of the plan which pertains to the surrender of collateral.

On May 13, 2003, the debtors filed a third modification which stated in paragraph III.4.b. that the home would be surrendered to Origen. The third modification changed the base amount of the plan to $20,341.12, without a change in plan payments. The modification made no reference to the plan term, but clearly the term would have been significantly less than 36 months. By stipulation between the Trustee and the debtors filed May 15, 2003, the base amount necessary to complete the plan and obtain a discharge was set at $36,334.97, payable over an estimated term of 37 months without a change in plan payments. The plan, as modified, was confirmed on June 16, 2003.

A post-confirmation modification was filed by the debtors on December 1, 2003, which is irrelevant to this controversy. A second post-confirmation modification was filed December 10, 2003, which was precipitated by the filing of a claim for past due child support. This sixth change to the plan provided for the payment of a child support obligation, changed the monthly plan payments, and increased the base amount to $50,623.32, payable over an estimated term of 50 months. Two years later, on December 21, 2005, the last filed modification terminated the plan distributions for child support. None of the post-confirmation changes in the plan referenced or modified the treatment of the Origen obligation or any unsecured obligation.

On August 30, 2006, three and one-half years after the filing of the Origen Proof of Claim, the debtors objected to that claim. In his administration of the plan, the Trustee had made disbursements based on the unsecured portion of Origen's bifurcated Proof of Claim of $29,055.33. From April 1, 2004 to August 2, 2006, when distributions were terminated due to the objection to the Proof of Claim, the Trustee had distributed $18,801.46 to Origen. In the objection to the Proof of Claim, the debtors requested that the claim be disallowed and that Origen be required to return the $18,801.46 to debtors.

Meanwhile, October 1, 2004, Origen foreclosed its lien non-judicially by making a credit bid of $107,000 at the foreclosure sale. On September 16, 2005, Origen sold the home for $120,000 to a third party and received net proceeds of $100,611.08, leaving a deficiency of $31,595.38 on the obligation.

The issues to be resolved by this Court are; 1) what is the proper amount and nature of Origen's allowed claim, and 2) how is that claim to be treated under the plan? Resolving these issues will determine whether Origen may retain the $18,801.46 it received as payment on the unsecured portion of its Proof of Claim, or

whether that sum should be returned to the Trustee, or whether it should be returned to the debtors. The resolution of these questions require the analysis of five separate, but intertwined legal issues.

## ISSUES

### Origen's Allowed Claim

1. Does the doctrine of laches defeat the objection to the Proof of Claim?

2. Should the Proof of Claim filed by Origen be allowed as filed, i.e., partially secured and partially unsecured?

### Treatment of Origen's Claim under the Plan

3. Is the plan *res judicata* as to the treatment of the unsecured portion of the claim? If the unsecured portion of the claim is disallowed, do the principles of *res judicata* preclude the return of disbursements based on the unsecured portion?

4. Does the modification of December 10, 2003, contain a clerical error?

5. What is the effect of the post-confirmation non-judicial foreclosure on the Origen claim?

### 1. *Laches*

Both debtors and creditor argue that the other is not entitled to relief based upon the doctrine of laches. The debtors waited approximately three and one-half years after the filing of the Proof of Claim to file an objection to it. The debtors waited until nearly the end of the plan term (*after* the plan term, based on debtors' contention that the term of the plan should be 37 months and not 50 months) to file an objection to the claim. The plan was confirmed June 13, 2003. Distributions did not commenced to this creditor until April 1, 2004, a year after the filing of the Proof of Claim. If an objection had been filed at any time during that year, this controversy could have been alleviated.

Criticism of the creditor's conduct is also appropriate. Despite the plan language that once property is surrendered the automatic stay is lifted and the creditor is free to exercise its state law rights, the creditor filed a motion to lift the automatic stay two months after confirmation. The order lifting stay was entered without objection by the debtors on September 10, 2003. Despite the fact that the Washington non-judicial foreclosure process can be accomplished within 90 to 120 days (RCW 61.24.140), the foreclosure did not occur until one year after entry of the unnecessary order lifting the automatic stay.

Laches is an equitable doctrine which precludes the granting of relief to a party which has unreasonably delayed in seeking relief and if the party against which the relief is sought is prejudiced by the delay. As evidenced by the facts recounted herein, delay, inattentiveness, confusion and lack of focus abound, and that is true of both parties.

Although prejudice to either of the parties involved in this controversy is difficult to find, this is a bankruptcy proceeding and thus involves many different interests. Laches is inappropriate if any prejudice to parties not involved in the delay would result from its application. It is readily apparent that should application of the doctrine of laches allow Origen to retain the funds, prejudice would result to innocent parties. There are nearly a dozen unsecured creditors which would be entitled to have the $18,801.46 distributed to them on a pro rata basis. Allowing Origen to retain the funds or allowing the debtors to receive the funds, and thus reduce the base amount paid under their confirmed plan by $18,801.46, would be prejudicial to the nearly dozen unsecured creditors. This precludes application of

laches for the benefit of either Origen or the debtors.

## 2. *Issue—Should the Proof of Claim be Allowed?*

To the extent a creditor holds a security interest in collateral which has a value less than the obligation, § 506 requires that the claim of the creditor be bifurcated. The creditor is allowed a secured claim in an amount which is equal to the value of the collateral and is allowed an unsecured claim in the amount of the obligation which is in excess of the value of the collateral.

■ When this case was commenced, Origen was the holder of a first position purchase money obligation for the principal residence of the debtors. Holders of such claims are treated differently under § 1322(b)(2) than holders of other types of secured claims. That subsection prohibits a modification of the rights of creditors secured by a lien on the debtors' principal residence. In *Nobelman v. American Sav. Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), the Supreme Court held that although bifurcation of many secured claims into both a secured and an unsecured claim was required by § 506(a), § 1322(b) precluded bifurcation of first position residential home mortgage claims. Chapter 13 debtors are required to pay residential mortgage lenders in accordance with the terms of the underlying obligation regardless of the value of the residence.

The only exception is when the creditor does not hold any secured claim as the value of the property is so low that there is no value at all to secure the lender's claim. This exception is inapplicable to the facts of this case as Origen was the first position lender and its Proof of Claim indicates there was value to support its lien.

■ Debtors are not allowed, due to the fact that the value of the home is less than the amount owed, to bifurcate the obligation owed to the residential lender into a secured and unsecured claim. A plan which would have modified the rights of Origen could not have been confirmed. Origen, simply by filing a Proof of Claim, cannot unilaterally modify its rights and then argue that the confirmed plan must be interpreted to modify those rights consistent with the Proof of Claim. Pursuant to *Nobelman*, Origen was not allowed to bifurcate its claim and thus modify its rights under the plan. The unsecured portion of the claim should be disallowed.

## 3. *Res Judicata Effect of Confirmed Plan*

■ Once a Chapter 13 plan is confirmed, the plan is *res judicata* as to all matters contained in the plan. *Trulis v. Barton*, 107 F.3d 685 (9th Cir.1995). Origen's position is that although § 1322(b)(2) does not allow a debtor to treat a claim secured by a lien on a residence as partially secured and partially unsecured, the debtors' confirmed plan so provides. Since the plan provides for the treatment of the claim as both secured and unsecured, even though such treatment is disallowed by the Code, the plan is *res judicata* and the claim must be treated in that manner. Origen's argument is a correct statement of the *res judicata* effect of confirmed Chapter 13 plans. *In re Pardee*, 193 F.3d 1083 (9th Cir.1999). The underlying premise that the plan treated the claim as both a secured and unsecured claim is incorrect however.

■■ Typically, Chapter 13 plans do not effect or purport to determine the nature and extent and validity of a claim. *In re Hobdy*, 130 B.R. 318 (9th Cir. BAP 1991). Confirmation of plans does not effect the validity of a claim nor its classification as secured or unsecured. Chapter 13 plans determine the treatment to be

accorded claims and are *res judicata* as to the treatment described in the plan. Plans are not *res judicata* as to the allowance or disallowance of a claim. Allowance of a particular claim is generally not referenced or effected by the plan. *In re Shook*, 278 B.R. 815 (9th Cir. BAP 2002). Even though § 502 provides that a proof of claim is "deemed allowed" absent objection, once an objection is filed, the nature, extent and validity of the proof of claim is no longer presumed. *In re Los Gatos Lodge, Inc.*, 278 F.3d 890 (9th Cir.2002).

Such determinations are made in the claims adjudication process. *In re Schweizer*, 354 B.R. 272 (Bankr.D.Idaho 2006). The plan confirmation process is separate and distinct from the claims adjudication process. Notice and hearing procedures regarding objections to the merits or classification of claims are established by § 502(b) and amplified by Fed. R. Bankr.P. 3007. Adjudication of claims requires that the party holding the claim have reasonable notice not only of the fact that an objection to that particular claim exists, but the basis for the objection. LBR 3007–1(a)(1)(c).

■ There is an exception to the general rule that confirmation of a Chapter 13 plan has no *res judicata* effect on the nature, extent or validity of a claim. That exception occurs when the plan specifically so provides.

■ Plans may modify the rights of the holders of claims in a manner disallowed by the Code if the plan clearly and specifically so provides and due process requirements are met.

> We now acknowledge that a plan can effectively determine value and/or avoid a lien only if the creditor receives clear notice that the plan will do so.

*In re Shook, supra,* at 824. The plan in this case did not refer to the unsecured claim of Origen with any specificity.

The plan specified that the home would be surrendered to Origen. That paragraph of the form plan reads as follows:

> b. Debtor surrenders the collateral securing the claims of the following creditors in satisfaction of the secured portion of such creditor's claim. To the extent the collateral does not satisfy such creditor's claim, the creditor shall be treated as the holder of an unsecured claim and paid as provided in section III.A6 (Priority Claims), if entitled to priority under 11 U.S.C. § 507, or if not, as provided in section III.A8 (Unsecured Claims). The entry of the order confirming the plan shall terminate the automatic stay of 11 U.S.C. § 362(a) as to the collateral surrendered, thereby allowing recovery and disposition of such property according to applicable non-bankruptcy law.

Origen relies upon the plan language which states that if the collateral is insufficient to satisfy the claim, the creditor shall be treated as the holder of an unsecured claim. Based on that language in the form, Origen argues that the plan specifically provided that it should be paid the unsecured portion of its Proof of Claim. The difficulty is that this form language is not specific to Origen, and at the time of filing the Proof of Claim, Origen was precluded from holding an unsecured claim by § 1325(b)(2). This form language is insufficient notice that § 1322(b) is being superceded by the plan.

At the time of surrender, Origen's secured claim was satisfied. Theoretically, Origen, after surrender of the home, could have judicially foreclosed upon the property and, if ultimate disposition of the prop-

erty had resulted in a deficiency, Origen would have then become the holder of an unsecured claim for the deficiency balance. To receive distributions under the plan on such a claim, it would have had to file a new proof of claim for the deficiency balance. Until post-confirmation events occurred, i.e., judicial foreclosure and ultimate disposition of the property, Origen would have no right to an unsecured claim.

 The plan is *res judicata* as to the treatment of Origen's claim. That treatment was surrender of the home. Should that surrender eventually result in Origen becoming the holder of an unsecured claim, that potential unsecured claim would be treated as other unsecured claims under the plan. There is no specific plan language which modifies or alters the effect of § 1322(b) or allows Origen an unsecured claim.

#### 4. *Issue—Clerical Error.*

 The debtors have now made plan payments totaling $50,813.28 for a plan with a base of $50,623.32. Should it be determined that Origen was not entitled to receive the distributions under the plan of $18,801.46, that sum would be returned to the Trustee for distribution to others as required by the plan. Erroneous distributions by a plan Trustee do not effect the base amount the debtors are required to pay to the plan.

The debtors argue, however, that due to a clerical error the correct base amount should be $40,011.29, thus they have paid more than required and Origen should return the $18,801.46 directly to them. Even assuming the debtors should have only paid a base of $40,011.29, they would have overpaid only $10,801.99 and would only be entitled to reimbursement of that amount. The difference between that amount and the $18,801.46 erroneously paid to Origen would have to be paid to

the Trustee for distributions to others as required by the plan.

The basis of the argument that the correct base is $40,011.29, and thus the debtors have overpaid the base by $10,801.99, is that a clerical error existed in the modification which contained the base amount of $50,623.32. The base amount of $50,623.32 is contained in the modification of December 10, 2003. Debtors allege that the base amount established by that post-confirmation modification as well as the estimated term of the plan at 50 months, were the result of a clerical error. That modification added, as a continuing claim under the plan, a monthly domestic support obligation payable to the Department of Social & Health Services (hereinafter "DSHS") in the amount of $200. It also added to the amounts to be disbursed under the plan an arrearage of $1,400 in a domestic support obligation to be paid to DSHS as a priority claim. The monthly plan payment was increased for a period of 13 months to fund these additional distributions under the plan.

The debtors' counsel in his Memorandum of Authorities points out that the correct mathematical calculation would result in a base of $40,011.29. The base of $50,623.32 results when the amount due on the DSHS arrearage claim is calculated at $14,000 rather than $1,400. No evidence exists explaining this error other than the calculations themselves.

The modification filed two years later, on December 21, 2005, the 35th month, deleted the $200 monthly continuing claim for domestic support. No change was made in the base amount of the plan or its estimated term. Any mathematical error contained in the prior modification was not corrected, although the later modification addressed the same subject (the support

obligation) as had the December 10, 2003 modification.

The Trustee's website indicates, of the $50,813.28 paid by debtors, the Trustee has disbursed $50,578 under the plan. The support obligation was overpaid by the Trustee who has since recovered the overpayment from DSHS. In addition to DSHS and Origen, the Trustee has made distributions to several unsecured creditors and calculated and paid trustee fees which are a percentage of the amount received from the debtors.

Clerical errors are addressed in Fed. R.Civ.P. 60(a) which provides:

(a) **Clerical Mistakes.** Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

In this situation, the alleged clerical error did not occur in a court order or judgment, but in a pleading filed by the debtors. The preliminary analysis in such situations is the same as in situations where the error occurs in a court-generated document. Is it a true mistake where the mechanics of the intent otherwise expressed in the document cannot be accomplished? Would making the correction reflect a change of intent rather than effectuating the original intention? *Blanton v. Anzalone,* 813 F.2d 1574 (9th Cir. 1987); *Harman v. Harper,* 7 F.3d 1455 (9th Cir.1993); *Jones & Guerrero Co., Inc. v. Sealift Pac.,* 650 F.2d 1072 (9th Cir.1981).

Mathematical errors are classic examples of clerical mistakes considered under Fed.R.Civ.P. 60(a). Often such errors are apparent on the face of the document. That is certainly not the situation here, however. There are four pre-confirmation changes and three post-confirmation changes of the plan containing four changes in the base amount to be paid to fund the plan and multiple changes in the monthly plan payments. Such circumstances alone render it difficult to fully comprehend the debtors' intent regarding the modification filed December 10, 2003. No clerical error is apparent on the face of the modification. After a review of the numerous prior changes in the funding and terms of the plan and more than cursory mathematical calculations, one concludes that the base amount referenced in the December 10, 2003, modification is a clerical error. After doing all the review and calculations, a priority support arrearage obligation of $1,400 results in a base of $40,011.29, but an incorrect arrearage amount of $14,000 results in a base of $50,623.32. The inadvertent use of the $14,000 rather than the $1,400 is a clerical error.

As to the term of the plan, no reason can be ascertained as to why the estimated term in the December 10, 2003 modification should be 37 months rather than the 50 months stated. However, this appears moot as this is now the 48th month after commencement of the case. Also, the plan term is only an estimate established by the base amount and monthly plan payments.

▉ There is another factor to be considered in granting relief under Fed. R.Civ.P. 60(a). Such relief is equitable in nature. The party who made the error is now requesting, nearly three years later, that it be corrected. If others have relied upon the error and acted in accordance

with the erroneous calculation, no relief from the error should be allowed if those parties would be prejudiced by the requested relief. *In re Anwiler,* 958 F.2d 925 (9th Cir.1992); *In re Clark,* 262 B.R. 508 (9th Cir. BAP 2001).

Two years after the erroneous modification, the debtors filed another modification which also addressed the support claim and terminated disbursements on that claim under the plan. There is no evidence indicating when the debtors or their counsel discovered the error in the December 10, 2003 modification, but, at a minimum, when the last modification was filed two years later, they had an opportunity to discover and correct the error.

In the three years which have elapsed since December 10, 2003, many parties have relied upon the erroneous base amount. Retroactively correcting the base amount would require the Trustee to recalculate his fees as they are a percentage of plan payments. Most importantly, nearly a dozen unsecured creditors which received distributions under the plan, would have to be contacted and required to return funds. The Trustee would incur the additional burden making the appropriate calculations and contacting those creditors. Those creditors would not only have to return the disbursements, but would have the expense and inconvenience of analyzing the Trustee's request. Such a result does not lead to confidence in the Chapter 13 system.

■ The debtors' counsel made the error. The convoluted history of this case, some of which could have been avoided by the debtors, contributed to the error. It has been three years since the error was made and it is unknown when it was discovered. Other parties relied upon the erroneous base amount and would be burdened and most likely prejudiced should the error be corrected retroactively. Under such circumstances, the debtors should not be granted the relief requested.

### 5. *Effect of the Non–Judicial Foreclosure*

As concluded above, as of the date of filing its Proof of Claim, Origen was not the holder of an unsecured claim. Nor did Origen take any of the steps necessary under state law to become the holder of an unsecured claim. The plan language relied upon by Origen provides that after property is surrendered, state law will effect its disposition. State law determines the creditors' post-surrender rights. A claim cannot be allowed if it is unenforceable under non-bankruptcy law. § 502(b)(1).

After surrender of the property by the debtors, Origen foreclosed on the property. State law precludes Origen from holding any claim against the debtors after the foreclosure. Of the $18,801.46 disbursed to Origen by the Trustee, $3,063.19 was disbursed between April 1, 2004 and October 1, 2004, the date of the foreclosure sale. Post foreclosure, $15,738.27 was disbursed. Pursuant to RCW 61.24.100(1), the debtors owed no obligation to Origen after the non-judicial foreclosure sale. RCW 61.24.100(1) states:

(1) Except to the extent permitted in this section for deeds of trust securing commercial loans, a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower, grantor, or guarantor after a trustee's sale under that deed of trust.

■ When Origen elected to foreclose non-judicially, it also elected to waive any right to collect a deficiency from the debtors should the value of the property be less than the obligation. *Helbling Bros., Inc. v. Turner,* 14 Wash.App. 494, 542 P.2d

1257 (1975). Post-foreclosure, Origen held no claim.

 As justification for the receipt of the $15,738.27 post-foreclosure, Origen first argues that the provisions of the confirmed plan preempt state law. As analyzed above, the language in the plan does not preempt state law. This argument has no merit. Origen then argues that the request to return the $18,801.46 should be denied as the funds were received in good faith and equity precludes their return. No cases have been cited for the proposition that equity precludes the return of funds paid to an entity which was not entitled to receive them. Origen is an entity engaged in the servicing of home loans and regularly appears in this Court. It should certainly be aware that Washington law precludes the collection of a deficiency after a non-judicial foreclosure. Yet Origen not only silently accepted funds for nearly two years after the foreclosure, it continued to silently accept funds for nearly a year after it had sold the real estate to a third party. Equity does not tip in Origen's favor.

## CONCLUSION

Origen's Proof of Claim is **DISALLOWED.** It was not entitled to receive the distribution totaling $18,801.46 and must return that amount to the Trustee for disbursement to other creditors under the plan. The Trustee is to further administer the case based on this Memorandum Decision.